UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| RODNEY G. LANG, SR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:23-CV-466-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| LOUISVILLE METRO GOVT., *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Partial Motion to Dismiss filed by Defendants Louisville Metro Police Department ("LMPD"), Louisville Metro Government ("Louisville Metro"), Officer M. Forbes, and Officer N. Hart. [R. 8]. Plaintiff Rodney G. Lang, Sr., responded [R. 9], and Defendants replied [R. 10]. For the following reasons, the Court will grant the motion in part and deny it in part.

## I.    Background

This action arises out of Louisville Metro Police officers' alleged use of excessive force during the arrest of Plaintiff Rodney Lang. According to Lang's Complaint, on September 18, 2022, Officers M. Forbes and N. Hart were dispatched to Lang's residence after he called 911 concerned over his wife's safety following a "verbal alterations [sic] with neighbors" where Lang "was unable to reach her." [R. 1 (Complaint), ¶¶ 12, 11]. When Lang noticed the officers approaching his residence, he "exited the residence, and met the officers on the porch." *Id.* at ¶ 13. Officer Forbes "immediately took hold of Mr. Lang's left wrist and advised that he was under arrest," and when Lang "inquired why he was being arrested," the Complaint alleges that Officer Forbes "threw Mr. Lang from the porch where he landed on the concrete sidewalk." *Id.* at ¶ 14.

According to the Complaint, Officer Hart, for her part, "did not intervene to de-escalate the situation[.]" *Id.* at ¶ 15. Lang sustained "a broken right hip, a broken nose, a laceration on the nose requiring stitches and two chipped teeth" as a result of his fall from the porch. *Id.* at ¶ 16. Lang was transported to a hospital where he remained from September 18, 2022, through September 21, 2022, and as of the time his Complaint was filed, Lang was scheduled for "a total right hip replacement on September 27, 2023." *Id.* at ¶ 20.

As a result of this incident, Lang brought this action on September 7, 2023. Counts I–IV, under 42 U.S.C. § 1983, allege constitutional violations for excessive use of force and violation of Lang's rights to free speech. Specifically, Lang brings claims against LMPD for deliberately indifferent policies, practices, customs, training, and supervision in violation of Lang's constitutional rights (Count I), against Louisville Metro for deliberately indifferent policies, practices, customs, training, and supervision in violation of Lang's constitutional rights (Count II), against Officer Forbes in his official and individual capacities for "willful, malicious, callous, deliberately indifferent and/or objectively unreasonable . . . disregard of Mr. Lang's federally protected constitutional rights" (Count III), and against Officer Hart in her official and individual capacities for deliberate indifference in failing "to intervene to de-escalate the interaction between Defendant Forbes and Mr. Lang before Mr. Lang was injured" (Count IV). *Id.* at pp. 7–20. Lang also alleged negligent hiring, training, and supervision against LMPD (Count V), negligent supervision and "oversight" against Louisville Metro (Count VI), and negligence against Officers Forbes (Count VII) and Hart (VIII) in their official and individual capacities. *Id.* at pp. 20–26. Lastly, Lang brought a battery claim against Officer Forbes (Count IX),[1] an intentional infliction

---

[1] This cause of action is incorrectly numbered as VIII in the Complaint, *see* [R. 1 (Complaint), p. 26], which is duplicative of the previous cause of action, *see id.* at p. 25, and should instead be labeled as Count IX. The numbering is similarly off for the remaining causes of action in the Complaint, but this Order correctly numbers the causes of action.

of emotional distress ("IIED") claim against Officer Forbes in his individual capacity (Count X) and sought declaratory relief (Count XI) and actual damages.

On October 11, 2023, the Defendants jointly moved to dismiss certain claims against them. *See generally* [R. 8-1]. Lang responded, agreeing that some of his claims against the Defendants should be dismissed and opposing dismissal of others. *See generally* [R. 9]. The Defendants replied, and the matter is ripe for review.

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences

are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

### III.    Analysis

As stated, Defendants move to dismiss several of Lang's claims. First, the Defendants argue that all of Lang's claims against LMPD should be dismissed because LMPD "is an agency of [Louisville] Metro and has no independent authority." [R. 8-1, p. 2]. Defendants also argue that Lang's § 1983 claims against Louisville Metro should be dismissed under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). [R. 8-1, pp. 3–5]. Relatedly, the Defendants argue that any claims against Officers Forbes and Hart in their official capacities must be dismissed, as they are properly claims against Louisville Metro. *Id.* at 5. Next, the Defendants contend that "any state claims raised against [Louisville] Metro must be dismissed" on sovereign immunity grounds. *Id.* at 5–6. The Defendants also argue that Lang's IIED claim "is a gap filler claim that must be dismissed," *id.* at 7, that Lang lacks standing to bring a claim for declaratory relief, *id.* at 7–8, and that Lang's claims for punitive damages are barred, as "[m]unicipalities are immune from punitive damages in §1983 claims," *id.* at 8–9. In his response, Lang concedes many of the arguments raised by the Defendants.

Lang concedes all but one of the Defendants' arguments, which the Court will address in turn.

### A.  Undisputed Issues

First, Lang acknowledges that "police departments are not suable under §1983, but that such claims, as here against the LMPD, are properly filed against Defendant Metro as the real party in interest." [R. 9, p. 3]. Lang therefore "does not oppose dismissal of his claims against the LMPD." *Id.* As such, the Court will dismiss Lang's claims against LMPD (Counts I and V).

Next, Lang "acknowledges that Defendant [Louisville] Metro, and by extension its agencies, officers and employees in their official capacities are entitled to sovereign immunity from state law claims pursuant to KRS 67C101(2)(e)" and, accordingly, he "does not oppose dismissal of his state law claims against Defendant Metro, LMPD, Forbes and Hart in their official capacities." [R. 9, p. 12]. Thus, the Court will dismiss Lang's negligent supervision and "oversight" claim against Louisville Metro (Count VI), and his negligence claims against Officers Forbes (Count VII) and Hart (Count VIII) in their official capacities. Along the same lines, Lang "acknowledges that official capacity suits against an officer are generally just another way of pleading an action against the entity for which they are an agent," and that "[a]s long as the government entity receives notice and an opportunity to respond, an official capacity suit is treated as a suit against the entity." *Id.* at 11–12. As such, "[b]ecause Defendant Metro received notice of this action, and clearly has had the opportunity to respond," Lang "does not oppose dismissal of the official capacity claims against Defendants Forbes and Hart." *Id.* at 12. The Court will therefore dismiss the official capacity claims against Officers Forbes and Hart brought in Counts III and IV.

In addition, Lang concedes that "a review of the relevant caselaw regarding claims of intentional infliction of emotional distress" reveals that such a claim "will not lie when the actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed." *Id.* at 12. "Because his Complaint includes causes of action for battery and negligence against both Defendants Forbes and Hart in their individual capacities," Lang "does not oppose dismissal of this [IIED] claim." *Id.* The Court will therefore dismiss Lang's IIED claim (Count X).

With respect to his claim for declaratory relief, Lang also "concedes that there is no real and immediate threat that the harm he experienced will occur in the future as is necessary to seek

declaratory relief" and, "[a]s such, Mr. Lang does not oppose dismissal of this claim." *Id.* at 12–13. The Court will therefore dismiss Lang's claim for declaratory relief (Count XI). Along the same lines, Lang acknowledges that "municipalities are immune from punitive damages under 42 U.S.C. § 1983," and notes that his "request for punitive damages is simply intended to preserve that claim to the fullest extent against any Defendant to which it applies at the time of judgement." *Id.* at 13. Punitive damages are not, however, a cause of action, *see Price v. AgriLogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014) (explaining that a claim for "punitive damages . . . is not an independent cause of action" but, "[r]ather, certain torts entitle a plaintiff to punitive damages") (citation omitted), and the Court therefore cannot "dismiss" Lang's request for punitive damages. The Court simply notes, for purposes of the record, that Lang has conceded his position on the issue and does not seek punitive damages against Defendant Louisville Metro.

Based on the foregoing concessions, only one issue remains disputed between the parties: whether Lang's claim under 42 U.S.C. § 1983 against Louisville Metro can proceed.[2]

## B.  Live Dispute – Section 1983 Claim against Louisville Metro

"If a police officer violates the Constitution, '42 U.S.C. § 1983 provides a civil remedy for those' injured by the violation." *Jackson v. City of Cleveland*, 925 F.3d 793, 813 (6th Cir. 2019) (quoting *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018)). "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal citation and quotation

---

[2] With respect to his Section 1983 claim, Lang suggests he "had clearly established constitutional rights under the Fourth and Fourteenth Amendments to be secure in his person from unreasonable seizure through excessive force[.]" [R. 9, p. 4]; *see also* [R. 1 (Complaint), ¶ 36]. The Defendants correctly note, however, that "unlawful seizure challenges as well as claims of excessive force are properly analyzed under the Fourth Amendment." [R. 10, p. 5]. Indeed, the Supreme Court has declared that "[a]ll claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard" under the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

marks omitted). "When the 'execution of a government's policy or custom . . . inflicts the constitutional injury,' the local government can be held liable under § 1983." *Weaver v. Louisville-Jefferson Cnty. Metro Gov't*, No. 3:24-CV-103-RGJ, 2024 WL 2819556, at *2 (W.D. Ky. June 3, 2024) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

When a plaintiff brings a Section 1983 claim against a municipality, like Louisville Metro, the Court considers: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992); *see also Vales v. Oldham Cnty. Jail*, No. 3:23CV-P645-JHM, 2024 WL 1543778, at *1 (W.D. Ky. Apr. 9, 2024) (reciting two-part *Collins* standard); *Robertson v. Perkins*, No. 1:21-CV-00073-GNS-HBB, 2023 WL 6165713, at *6 (W.D. Ky. Sept. 21, 2023) (same).

Importantly, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994); *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *Dye v. LMDC*, No. 3:22-CV-P164-RGJ, 2022 WL 3570353, at *3 (W.D. Ky. Aug. 18, 2022) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988)).

In their Motion to Dismiss, the Defendants concede, for purposes of this analysis only, the first prong of the Section 1983 analysis: "that Plaintiff's Constitutional rights were violated." [R. 8-1, p. 3]. Their motion focuses, instead, on the second prong: whether Louisville Metro is

responsible for that violation. *Collins*, 503 U.S. at 120. To demonstrate municipal liability for a constitutional violation (in other words, to satisfy the second prong of the Section 1983 analysis), a plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injur[ies] w[ere] incurred due to execution of that policy." *Brawner v. Scott Cty.*, 14 F.4th 585, 598 (6th Cir. 2021) (quoting *Morgan v. Fairfield County*, 903 F.3d 553, 566 (6th Cir. 2018) (internal quotations omitted)). "There are four ways a plaintiff may prove the existence of a municipality's illegal policy or custom: '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532, 537 (W.D. Ky. 2020) (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)); *see also Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (outlining four ways to demonstrate a policy or custom that could allow for municipal liability).

   With respect to this claim, Defendants' motion focuses almost exclusively on the fact that Lang's "sole factual support" for his Section 1983 claim "includes various references to [a] Department of Justice ('DOJ') Report" issued March 8, 2023, which contained certain findings after an investigation into use-of-force incidents involving LMPD that occurred between January 1, 2016, and October 9, 2021. [R. 8-1, p. 4]. *See also* DOJ Report, https://www.justice.gov/opa/pr/justice-department-finds-civil-rights-violations-louisville-metro-police-department-and (March 8, 2023). Defendants suggest that "[r]eferences to the DOJ Report have no relevance to the case at hand" because "Plaintiff's arrest for domestic [violence] that is

- 8 -

the subject of this lawsuit occurred on September 17, 2022," which was outside the time period of the DOJ's investigation. [R. 8-1, p. 4].

In response, Lang suggests the DOJ Report is relevant and may properly be considered by this Court because "[w]hile the incident did not occur within the period of the investigation, it occurred so close in time as to be relevant to the consideration of whether there was any meaningful departure from the unconstitutional behavior uncovered by the DOJ." [R. 9, p. 8]. For the following reasons, the Court agrees with Lang.

The Court notes, first, that although in general "matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), the Court "may consider the complaint and its exhibits, public records, items in the record, and exhibits attached to the defendant's motion to dismiss *if they are referenced in the complaint and central to the plaintiff's claims* without converting the motion to a summary judgment motion." *Ward v. City of E. Cleveland*, No. 1:22-CV-00372, 2023 WL 2787965, at *3 (N.D. Ohio Apr. 5, 2023) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (emphasis added). Here, it is without doubt that the DOJ Report— which is a matter of public record—is both referenced in the Complaint and central to Lang's claims. The Court therefore may consider reference to the DOJ Report in Lang's Complaint and the Report itself without converting the Defendants' motion to dismiss to one for summary judgment.

Even so, the Defendants suggest the DOJ Report still should not be considered by this Court because it has "no relevance to the case at hand." [R. 8-1, p. 4]. Federal Rule of Evidence 401 deems evidence relevant if it has "any tendency to make a fact more or less probable," Fed. R. Evid 401, and therefore "sets an extremely low bar" for relevancy. *In re Ford Motor Co. Spark*

*Plug and 3-Valve Engine Prods. Liab. Litig.*, 98 F.Supp. 3d 919, 922 (N.D. Ohio 2014) (citing *Cambio Health Solutions LLC v. Reardon*, 234 Fed. Appx. 331, 338 (6th Cir. 2007)). In light of this "low bar," other courts in the Sixth Circuit have reasoned that even where evidence of prior or subsequent similar constitutional violations may not necessarily be used to conclusively establish municipal liability under § 1983, the evidence may still be relevant. *See, e.g.*, *Abdur-Rahim v. City of Columbus*, No. 2:17-CV-601, 2019 WL 1873222, at *3 (S.D. Ohio Apr. 26, 2019) (explaining that while "a handful of cases from the Eighth Circuit have questioned whether evidence of activity after the alleged constitutional violation can be used to establish municipal liability under § 1983 . . . those cases did not reject evidence of subsequent similar events on relevancy grounds" and "the clear majority of case law supports the conclusion that subsequent incidents could be probative of what policies, practices, or accepted customs existed at the time of the incident at issue, which would be relevant to Plaintiffs' *Monell* claims").

Even more recently, in *Jackson v. City of Cleveland*, 622 F. Supp. 3d 636 (N.D. Ohio 2022), the Northern District of Ohio considered a similar relevance argument as that raised by Louisville Metro here. In *Jackson*, the plaintiff was wrongfully convicted of murder in 1991 and spent 27 years in prison. *Id.* at 639. After his exoneration in 2019, the plaintiff sued the City of Cleveland, alleging supervisory liability under *Monell* and citing to actions between 1966 and 1975 to show that unconstitutional policies and practices existed "well before Jackson's prosecution and continuing beyond his conviction." *Id.* The City of Cleveland moved to dismiss the plaintiff's claims, arguing the plaintiff had pointed to "no specific prior instances of unconstitutional conduct from any time frame relevant to Plaintiff's claims," since his arrest occurred in 1991, more than a decade after the most recent incident of misconduct alleged in the complaint. *Id.* at 644–45. But the court reasoned that, "in the present procedural posture Plaintiff enjoys the benefit of an

inference that the custom of tolerating or the acquiescence in violations of constitutional rights was so firmly entrenched that it persisted well after the dates of the specific allegations to which the City points." *Id.* at 645. And because "the complaint contain[ed] extensive and detailed allegations that the Cleveland police engaged in widespread and deeply rooted unconstitutional practices," the court rejected the City of Cleveland's attack "on the temporal proximity" of those factual allegations, concluding that the plaintiff "state[d] a claim for municipal liability against the City on each of the theories available under *Monell*." *Id.*

Perhaps most telling, earlier this year, the Sixth Circuit Court of Appeals took judicial notice of the same DOJ Report at issue in this case when considering an appeal of a summary judgment ruling disposing of an inadequate training or acquiescence claim under *Monell. See Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *12 (6th Cir. May 13, 2024). In *Stucker*, the district court granted summary judgment in favor of Louisville Metro without the benefit of having considered the DOJ Report, which was published during the appeal process. *Id.* The appellants referenced the DOJ Report in their appellate briefing and asked the Sixth Circuit to take judicial notice of it when considering the appeal. *Id.* The Sixth Circuit specifically found that, "[u]nder our authority to take judicial notice and our caselaw determining that *such reports may be relevant* to proving a policy or custom under a *Monell* claim, . . . we take judicial notice of the Report[.]" *Id.* (emphasis added). Because the Sixth Circuit found the DOJ Report may be relevant, it ultimately concluded: "Because the district court did not have the Report when it previously rejected Plaintiffs' *Monell* claim, we vacate the district court's decision on this issue and remand for the district court to consider in the first instance whether the evidence, including the 2023 DOJ Report, creates a dispute of material fact as to LMPD's deliberate indifference[.]" *Id.* at *13.

Given the "extremely low bar" for relevancy, *In re Ford Motor Co.*, 98 F.Supp. 3d at 922, and considering the treatment of similar issues by the Sixth Circuit and district courts in this circuit, this Court is unconvinced by Defendants' position that the March 8, 2023 DOJ Report is not relevant to this case. Importantly, as the *Jackson* court indirectly acknowledged, the core question is simply whether Lang has alleged, with sufficient factual support, "a custom of tolerating or the acquiescence in violations of constitutional rights," making it plausible that Louisville Metro is responsible for the constitutional violations that caused Lang's injuries. *Id.* at 644. As will be discussed further below, the Court finds that Lang has done so.

The only case Defendants cite to support their position on this issue is *Yatsko v. Graziolli*, 458 F. Supp. 3d 717 (N.D. Ohio 2020), *aff'd in part, appeal dismissed in part*, No. 20-3574, 2021 WL 5772527 (6th Cir. Dec. 6, 2021). However, *Yatsko* is inapposite for several reasons. First, and importantly, the *Yatsko* court considered motions for summary judgment, which invokes an entirely different, and far more stringent standard than the Court employs at the pleading stage.

But even setting that aside, the posture of *Yatsko* also renders it distinguishable. The underlying facts of *Yatsko* involved an off-duty, plain clothed Cleveland Police officer who fatally shot an individual during an altercation. In *Yatsko*, as relevant here, the City of Cleveland moved for summary judgment on the plaintiffs' *Monell* claim where the only evidence of the city's "custom of tolerance" of off-duty officers' use of excessive force was a December 4, 2014 DOJ Report concerning the Cleveland Police Department's use of force policies. *Id.* at 717. Crucial to the court's decision to grant summary judgment on the *Monell* claim was the fact that the December 4, 2014 DOJ Report was issued four years *before* the use-of-force incident that gave rise to the plaintiffs' claims, which occurred in 2018. *Id.* The court therefore reasoned that the Report, which concerned "actions of on-duty officers before 2014 is not probative to whether the

city had notice of a clear and persistent pattern of unlawful activity among its off-duty officers in 2018." *Id.*

Here, in contrast, both the DOJ Report and the facts of Lang's Complaint pertain to the actions of *on-duty* LMPD officers. And, more importantly, the DOJ's Report on LMPD issued on March 8, 2023, six months *after* Lang's arrest. Indeed, Lang's arrest was close enough in time to the DOJ's investigation that it occurred *after* the investigation concluded but *before* the Report issued. Still, Defendants suggest that because the DOJ's investigation concerned use-of-force incidents between January 1, 2016, and October 9, 2021, and Lang's arrest occurred eleven months after that investigation period, that "[r]eferences to the DOJ Report have no relevance to the case at hand." [R. 8-1, p. 5]. This argument is unconvincing, given the close temporal proximity between the investigation and Lang's arrest. *See Jackson*, 622 F. Supp. 3d at 643–44 (finding "Plaintiff states a claim for municipal liability against the City . . . under *Monell*" where complaint "contain[ed] extensive and detailed allegations that the Cleveland police engaged in widespread and deeply rooted unconstitutional practices" prior to the conduct that gave rise to lawsuit such that plausibly alleged "the custom of tolerating or the acquiescence in violations of constitutional rights was so firmly entrenched that it persisted well after" the prior instances).

Another court in this district recently reached the same conclusion in a similar *Monell* action. In *Weaver v. Louisville-Jefferson County Metro Government*, Louisville Metro raised the same argument that they raise before this Court—that "the sources cited by Plaintiffs," including the same "Department of Justice ('DOJ') Report, . . . all predate the time of the alleged events in the complaint, and so 'none of these references establish that a pattern or practice existed at the time of the investigatory stop that is the subject of this lawsuit.'" No. 3:24-CV-103-RGJ, 2024 WL 2819556, at *3 (W.D. Ky. June 3, 2024). And in *Weaver*, Louisville Metro similarly relied on

*Yatsko* for support. *See id.* In rejecting this argument, the Weaver court first noted that "*Yatsko* was before the court on summary judgment, not a motion to dismiss," *id.*, an important distinction this Court has already mentioned. And in finding that the plaintiffs had met their burden at the pleading stage of plausibly alleging constitutional violations, the court went on to explain:

> It is true that the news articles and reports cited by Plaintiffs predate the incident at the heart of the complaint, but Plaintiffs are only required to plausibly allege the existence of a policy or custom at this early stage in the litigation. While these sources may not affirmatively show that the same policies or customs they describe still existed at the time of the events in question, when coupled with the other allegations in the complaint, Plaintiffs do enough to plausibly allege that similar policies or customs have continued within LMPD.

*Id.* The same is true here. This case is entirely unlike *Yatsko*, which proceeded to summary judgment and where both the DOJ's investigation occurred, and its Report issued, more than four years before the use of force incident that gave rise to the case. *Yatsko*'s holding thus does not render Lang's claim implausible simply because some of his factual assertions rely in part on the DOJ's Report. Contrary to Defendants' position, the DOJ's Report is at least relevant, as it could be "probative of what policies, practices, or accepted customs existed at the time of the incident at issue, which would be relevant to [Lang's] Monell claims." *Abdur-Rahim*, 2019 WL 1873222, at *3. Having determined that it was not improper for Lang to reference the DOJ Report in his Complaint, the Court considers whether the Complaint states a plausible claim for relief against Louisville Metro under *Monell*.

Lang submits that "[i]t is by the third and fourth methods" of demonstrating municipal liability under *Monell* "that Defendant [Louisville] Metro's liability is created in the case at bar." [R. 9, p. 5]. However, Lang only goes on to discuss his theory of liability under the fourth method. Lang also mistakenly refers to the fourth "tolerance or acquiescence" method as the "third method of establishing liability, the 'inaction theory.'" [R. 9, p. 5]. In doing so, Lang cites *Scott*, 503 F.

- 14 -

Supp. 3d at 539, but that case, when referring to the "inaction theory," is doing so as another name for the "tolerance or acquiescence" theory. *See id.* at 538 ("Plaintiffs also allege that Louisville Metro has a *custom of acquiescence* to 'unconstitutional uses of crowd-control weaponry against peaceful protesters.'") (emphasis added). Thus, although Lang appears to conflate the two theories at various points, it seems he actually relies only on the fourth "tolerance or acquiescence" theory.

Under that theory of Section 1983 liability, in order to state a plausible claim, a plaintiff must allege:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (alterations in original); *see also Woodall v. Wayne Cnty., Michigan*, No. 20-1705, 2021 WL 5298537, at *6–7 (6th Cir. Nov. 15, 2021) (quoting *Thomas* four-part test). Lang's Complaint plausibly alleges each of these elements.

First, Lang has sufficiently alleged "the existence of a clear and persistent pattern of illegal activity." *Id.* (cleaned up). Importantly, "[o]ne instance of potential misconduct is insufficient to show a clear and persistent pattern of constitutional violations." *Scott*, 503 F. Supp. 3d at 538–39 (citing *Stewart v. City of Memphis*, 788 F. App'x 341, 347 (6th Cir. 2019). "However, such a pattern is shown by 'enough similar incidents' sufficient to put officials on notice that persons 'would be subject to constitutional deprivation' if the problem is not remedied." *Id.* at 539 (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989)). Here, Lang has alleged that LMPD officers have a pattern of using "force disproportionate to the threat or resistance posed . .

. simply because people do not immediately follow their orders, even when those people are not physically resisting officers or posing a threat to anyone" or "to inflict punishment or to retaliate against those challenging their authority." [R. 1 (Complaint), ¶ 23] (citing DOJ Report, p. 12). More specifically, Lang alleges, and the DOJ Report found, that LMPD officers "have used unreasonable force against peaceful protesters, people with disabilities, and teenagers." *Id.*

Lang cites to portions of the DOJ Report which detail specific instances of excessive force and escalation similar to that which allegedly occurred during his arrest. For example, Lang cites to the DOJ's findings concerning LMPD officers' response to a domestic violence report, where officers arrived to find no altercation yet responded with significant and immediate force:

> Instead, they encountered a Black man and a white woman walking away from each other on the sidewalk in front of their home, where their five children were inside. Officers made no attempt to investigate what had happened, but rather walked up to the man and immediately told him, "Put your hands up here." The man, whose hands were visibly empty, calmly asked why. Officers did not answer him, even though our law enforcement expert noted that appropriate de-escalation would have involved approaching the man calmly and explaining why he was being stopped. Instead, officers grabbed the man and continued pulling at him. Officers eventually took the man to the ground and tased him three times. They gave no warning before deploying the taser and gave the man no opportunity to comply in between the tasings. The second and third tasings occurred as the man laid on his stomach while screaming, "I'm done! I'm done! Please stop!" Officers handcuffed the man and left him lying on the ground while his kids cried out, "Is he dead? Is my daddy dead?" Officers not only failed to de-escalate, but in fact escalated the encounter by grabbing the man within seconds of arriving on scene. Indeed, the man told officers, "I would've complied if you said, hey, step on the steps and let me talk to you." Their unsound tactics resulted in at least two unreasonable tasings and traumatized the five young children who witnessed the event.

DOJ Report, pp. 18–19; *see also* [R 1 (Complaint), ¶¶ 25–27]. This incident is similar to that alleged by Lang, whereby he called for a welfare check on his wife, but as soon as he "met the officers on the porch . . . Officers Forbes immediately took hold of Mr. Lang's left wrist and advised that he was under arrest," then "threw Mr. Lang from the porch where he landed on the concrete sidewalk" when he "inquired why he was being arrested." [R. 1 (Complaint), ¶¶ 13–14].

- 16 -

Relatedly, Lang also alleges that LMPD officers have a pattern of using "takedowns, strikes, and other bodily force in ways that are unnecessary and unlawful," *id*. at ¶ 24, that LMPD officers have a pattern of "rush[ing] into encounters without adequately weighing the threat or resistance presented by the individual involved," "fail[ing] to de-escalate the situations they face," and "engag[ing] in escalating behavior that startles, confuses, or angers the individuals they encounter," *id*. at ¶ 25, and that LMPD officers have a pattern of "ratchet[ing] up tensions and escalat[ing] situations," *id*. at ¶ 26. In making these allegations, Lang again cites to the DOJ Report, which outlines another specific incident of force similar to that which allegedly took place during Lang's arrest:

> We also reviewed incidents where officers tackled individuals suspected of low-level crimes off of their bikes, *throwing them onto the pavement with no apparent exigency*. For example, officers were pursuing a Black 18-year-old in the middle of the night because he fled on his bike after reportedly picking up a backpack that officers believed contained marijuana. An officer found the teen and tackled him off of his bike without announcing himself or giving any commands to stop. Other officers descended on the teen after he was tackled and on the ground. At one point, four officers were on top of him, even though he was lying still on his stomach with his hands being held by officers. An officer then grabbed the teen's head and pushed it into the pavement for several seconds. When the teen exclaimed "My head bro, my head!" another officer replied, "You'll be alright." After handcuffing the teen, officers repeatedly taunted him, saying that he was going to "big boy jail." In all of these incidents, officers violated core constitutional principles but were not held accountable for their misconduct.

DOJ Report, p. 17 (emphasis added); *see also* [R. 1 (Complaint), ¶ 24]. Again, this incident is factually similar to Lang's allegations that Officer Forbes "threw Mr. Lang from the porch where he landed on the concrete sidewalk." [R. 1 (Complaint), ¶ 14]. Accepting these facts as true and drawing all reasonable inferences in Lang's favor, as the Court must at this stage, the Complaint offers a "clear and consistent pattern of illegal activity" by LMPD officers.

Second, Lang's Complaint sufficiently alleges that Louisville Metro had notice of LMPD's alleged pattern of conduct, as it details the DOJ's investigation into LMPD and Louisville Metro,

as well as its March 8, 2023 Report, which was published nationwide. *See Scott*, 503 F. Supp. 3d at 39 (finding Louisville Metro had "either actual or constructive notice of a pattern of constitutional violations is sufficient for purposes of [evaluating a] motion to dismiss" where complaint cited "local and national news articles that report on LMPD's alleged use of aggressive crowd control methods, such as tear gas and rubber bullets" and "press conferences in which city officials were questioned about LMPD conduct regarding the protests"). Here, the Defendants acknowledge in their Motion to Dismiss that city officials were actively working with the Department of Justice on a remedial action plan while its investigation was still ongoing, which was shortly before Lang's arrest occurred. *See* [R. 8-1, p. 4]. It is thus plausible that Louisville Metro was on notice of the alleged pattern of excessive force by LMPD officers prior to Lang's arrest. Indeed, Lang's Complaint outlines "enough similar incidents" of excessive force immediately prior to his arrest "sufficient to put [Louisville Metro] on notice that persons 'would be subject to constitutional deprivation' if the problem [was] not remedied." *Scott*, 503 F. Supp. 3d at 539.

Third, the Complaint offers facts sufficient to plausibly allege that Louisville Metro's "tacit approval of the unconstitutional conduct . . . can be said to amount to an official policy of inaction." *Thomas*, 398 F.3d at 429. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Miller v. Calhoun Cty.*, 408 F.3d 803, 815 (6th Cir. 2005). This "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Id.* According to the Complaint, even in the face of prior constitutional violations, LMPD officers were not provided proper training concerning "use of force and protection of free speech when engaging with citizens," nor were they provided proper "de-escalation training." *Id.* at ¶¶ 65, 48; *see also id.*

- 18 -

at ¶ 28 ("First, LMPD fails to adequately support and supervise officers. Second, LMPD fails to investigate and discipline officers for misconduct. Third, Louisville Metro has failed to provide sufficient external oversight to compensate for these deficiencies. This lack of accountability allows legal violations to go unchecked.").

Yet, in their Motion to Dismiss, the Defendants argue that Lang cannot show Louisville Metro failed to take corrective measures because "[w]hile the investigation was ongoing, Louisville Metro and LMPD took significant and important action to begin to address these issues." [R. 8-1, p. 4]. The Defendants point to an Agreement in Principle between the Department of Justice, Louisville Metro, and LMPD executed on the same day the Report issued, March 8, 2023. But evidence of "specific [remedial] action taken by Louisville Metro," such as that which Defendants point to in the Agreement in Principle, "may be relevant on a motion for summary judgment" and "is outside the scope of the present motion [to dismiss]." *Scott*, 503 F. Supp. 3d at 539; *see also Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 598 (W.D. Ky. 2020) (explaining that "at the summary judgment phase, the plaintiffs may lose on [their] *Monell* claim — on custom, on causation, or on both," but "at the motion to dismiss stage, Plaintiffs have plausibly pleaded that Louisville Metro has a custom of not having officers wear or activate body cameras and that this custom caused their injuries").

Indeed, the Defendants even acknowledge that, at the pleading stage, the Court cannot make the factual determination of whether Louisville Metro took adequate corrective measures in the face of prior constitutional violations. *See* [R. 10, pp. 3–4] ("Whether the report may have relevance at a trial in the matter where a jury would have the opportunity to weigh the Report against other evidence is not at issue."). And while discovery could ultimately reveal that the remedial measures taken absolve Louisville Metro of *Monell* liability, at this stage, the Defendants

have not even outlined what those specific remedial measures were, and "the Court is required not only to presume all alleged facts are true, but also to draw all reasonable inferences in favor of Plaintiffs." *Milby v. Underwood*, No. 3:23-CV-49-RGJ, 2024 WL 345525, at \*6 (W.D. Ky. Jan. 30, 2024). Because Lang has alleged that an LMPD officer used excessive force during his arrest, which took place after Louisville Metro was on notice of the DOJ's investigation into systemic use of excessive force within LMPD, the Complaint makes it at least plausible that Louisville Metro failed to take adequate corrective measures to prevent Lang's injuries.

Lastly, Lang has adequately alleged that Louisville Metro's custom of acquiescence was the cause of his injuries. *See* [R. 1 (Complaint), ¶ 58] ("Defendant Louisville [Metro] fails to provide sufficient external oversight of Defendant LMPD which has resulted in civil rights violations and injuries to citizens, and particularly to Mr. Lang."). "At the motion to dismiss stage, it is sufficient for a plaintiff to plausibly allege an unlawful policy or custom and a direct causal link to the harm." *Milby*, 2024 WL 345525, at \*5 (citing *Daugherty v. Louisville-Jefferson Cnty. Metro Gov't*, 495 F. Supp. 3d 513, 524 (W.D. Ky. 2020)). On the facts offered by Lang, it is plausible to infer that Louisville Metro's failure to provide sufficient oversight over LMPD concerning its use-of-force policies was the "moving force" behind or direct causal link to Lang's injuries stemming from an incident of alleged excessive force. *Thomas*, 398 F.3d at 429. *See also Scott*, 503 F. Supp. 3d at 540 ("If we accept Plaintiffs' allegations as true, it is at least plausible that Louisville Metro's alleged failure to act on city officials' knowledge of potential constitutional violations over the course of several days of protests was the 'moving force' behind subsequent violations of the same type."); *Jones*, 482 F. Supp. 3d at 598 (finding it "plausible to infer" that alleged systemic failure of LMPD officers to use body cameras "will result in a city-wide increase, to some degree, in incidents of excessive force").

Accordingly, the Court finds that Lang has sufficiently pleaded all four elements of the "tolerance or acquiescence" theory of municipal liability under *Monell* to survive dismissal under Rule 12(b)(6). For these reasons, the Court will deny Defendants' motion with respect to Lang's § 1983 claim against Louisville Metro.

## IV.    Conclusion

For the foregoing reasons, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendants' Partial Motion to Dismiss [**R. 8**] is **granted in part** and **denied in part.**

   a. Plaintiff's claims against LMPD (Counts I and V) are **DISMISSED**.

   b. Plaintiff's negligent supervision and "oversight" claim against Louisville Metro (Count VI), and his negligence claims against Officers Forbes (Count VII) and Hart (VIII) in their official capacities are **DISMISSED**.

   c. Plaintiff's intentional infliction of emotional distress claim (Count X) is **DISMISSED**.

   d. Plaintiff's declaratory relief claim (Count XI) is **DISMISSED**.

   e. Plaintiff's 42 U.S.C. § 1983 claims against Officers Forbes and Hart **in their official capacities** are **DISMISSED** from Counts III and IV.

   f. Plaintiff's 42 U.S.C. § 1983 claim against Louisville Metro **SHALL** proceed.

This the 9th day of July 2024.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

Cc: Counsel of record